Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| P.M., and S.M., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, and the CLEANSLATE HEALTH & WELLNESS PLAN. <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:21-cv-00480 - DBP |

Plaintiffs P.M. and S.M., through their undersigned counsel, complain and allege against

Defendants Cigna Health and Life Insurance Company ("Cigna") and the CleanSlate Health &

Wellness Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. P.M. and S.M. are natural persons residing in Hartford County, Connecticut. P.M. is

   S.M.'s father.

1

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). P.M. was a participant in the Plan and S.M. was a beneficiary of the Plan at all relevant times.

4. S.M. received medical care and treatment at the Austen Riggs Center ("ARC") from May 23, 2017 to December 26, 2018. ARC is a psychiatric treatment facility located in Massachusetts, which provides a continuum of mental health services, including residential treatment, to individuals with mental health, behavioral, and/or substance abuse problems.

5. Cigna, acting in its own capacity or through its subsidiary and affiliate Cigna Behavioral Health, denied claims for payment of S.M.'s medical expenses in connection with his treatment at ARC.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because Cigna does business in Utah and across the United States. Moreover, litigating the case in Utah rather than in another location will reduce the Plaintiff's out of pocket costs. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.M.'s Developmental History and Medical Background

9. S.M. suffered from anxiety and depression from a very young age, these were aggravated by the death of his grandmother around the time that he was six years old. S.M. started therapy, which initially seemed to help but he then started showing signs of obsessive compulsive disorder. He would erase his papers so hard that he put holes in them or would compulsively touch the floor when his name was called at school.

10. S.M. refused to use a microwave because he thought the radiation was harming him. He would also refuse to eat or drink unless he could find the "right" plate or glass.

11. S.M. became phobic of germs in particular and would compulsively wash his hands. He had an irrational fear of chemicals in everyday objects, and his fear of germs was so encompassing that he sometimes lay paralyzed in bed, terrified of even putting his feet on the ground. These behaviors made it difficult to participate in activities he used to enjoy or to socialize.

12. S.M. attempted a variety of medications and met with more than six psychologists, a psychiatrist, and also had a hospital evaluation, but he continued to suffer from

debilitating mental health conditions. S.M was paranoid that people were following him, started suffering hallucinations, punched holes in the walls, and was physically aggressive. He was able to graduate high school but failed out of college and spent a significant portion of his time at home drinking and smoking cannabis.

## ARC

13. S.M. was admitted to ARC on May 23, 2017. The initial portions of were approved under another insurer, however when the Plaintiffs' insurance policy shifted from that insurer to Cigna on February 8, 2018, Cigna elected to deny payment.

14. In a letter dated February 20, 2018, Cigna expounded on its decision to deny payment for S.M.'s treatment. The letter stated that "The service you requested is not covered." It further stated that:

> Based upon the available information, your symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Adults for admission and continued stay from 2/8/18 as there is no medical or psychiatric intervention necessary that requires round-the-clock monitoring of a residential program. Less restrictive levels of care are available for safe & effective treatment.

15. The letter also apologized that the Plaintiffs were not notified of the decision to deny care within a timely manner and stated that going forward they would be notified of the decision within the correct timeframe. The letter assured the Plaintiffs that "in most cases" the provider was notified that care had been denied even if the Plaintiffs had not been.

16. On June 6, 2018, P.M. appealed the denial of payment for S.M.'s treatment. P.M. pointed out that his previous insurer had determined all of S.M.'s treatment to be medically necessary and that it was only after Cigna became responsible for coverage that payment

was denied. He argued that S.M.'s treatment was medically necessary, and it had finally

allowed him to make significant gains.

17. In a letter dated August 1, 2018, Cigna upheld the determination to deny payment. The

letter offered the following justification for the denial:

> Based upon the available clinical information, your symptoms did not meet
> Cigna's Behavioral Health Medical Necessity Criteria for continued stay at the
> Residential Mental Health Treatment for Adults level of care from 02/08/2018.
> You were described as being able to understand information presented to you.
> There is no report of your being medically unstable enough to require 24-hour
> management for safety. There was not documentation of immediate threat to
> anybody. The treatment plan had led to measurable clinical improvement in your
> acute symptoms and/or progression towards discharge from the present level of
> care. You were not involved to the best of your ability in the treatment and
> discharge planning process as it had been noted that you had researched how to
> acquire marijuana and used on pass after months of treatment. Your continued
> stay was primarily for the purpose of providing a safe and structured environment.
> There is no clear plan on what robust improvement is expected from a specific
> intervention. You appear to be at a baseline of functioning where external
> supervision of your ongoing behaviors, including substance use, is the need.
> Continued stay in a residential setting to teach general life skills is not justified as
> this could just as effectively be done in a therapeutic group home. Your continued
> stay was primarily due to lack of external supports. Less restrictive levels of care
> were available for safe and effective treatment if you are truly motivated to
> change. The initial denial is upheld.

18. On January 4, 2019, S.M. requested that the denial of his treatment be evaluated by an

external review agency. He asked that the information he provided be reviewed by an

appropriately qualified reviewer and that he be given a detailed accounting of the

decision.

19. S.M. argued that Cigna had not provided sufficient reasoning to justify its decision to

deny care. He wrote that he received care on the recommendation of his treatment team

that had worked with him on a firsthand basis and included letters of medical necessity

from some of these providers with the appeal. In a letter dated September 29, 2017,

Sandra Hartdagen, Ph.D. wrote in part:

I first met [S.M.] on 12/15/2014, meeting with him approximately weekly until May 2015 when he became increasingly symptomatic, confused, and unable to function well (at school, home, or with others). By January of 2017 it was clear that psychotic disorganizing experiences were becoming more difficult for him to mask and he began disclosing increasingly paranoiac, confused, perceptual experiences. He had been unable to work for four months and was on probation at the University of Connecticut (surprising, given his academic work ethic and previous academic performance). Soon, with support from his parents, he withdrew from school.

Although [S.M.] had a considerable history of becoming severely depressed, of obsessive-compulsive symptoms, and significant social anxiety, these were not the core of his presentation. It became increasingly clear that he was significantly impaired in his ability to make accurate sense of his interactions with others and of the world around him. His isolation became profound, outbursts at home more frequent, and his overall grooming was poor.

It was clear that [S.M.] required long-term, effective inpatient treatment to properly assess and treat his presentation of severe mental illness. As expected, he has made progress since entering the program at Riggs, progress that I would not expect to continue if he did not remain for the foreseeable future.

My strongest clinical recommendation, most likely to result in [S.M.] receiving maximum clinical benefit resulting in his best chance at eventually functioning independently, is that he remain in a long-term inpatient facility for the duration required for him to reach his maximum clinical benefit and then an appropriately supported transition to a step-down living situation with adequate therapeutic support.

Heather Forouhar-Graff, M.D. wrote in part in a letter dated June 28, 2018:

During his time in treatment at the Austen Riggs Center, [S.M.] has made gains in his capacity to work and function socially, though these gains have not been sustained. He has almost completely stabilized in terms of his psychotic symptoms and cannabis use disorder. He has managed to step down from our highest level of care to one of our step-down programs where he lives with and cooperates with a small group of peers. He does however, continue to suffer from significant symptoms of depression including suicidal fantasies, social isolation and neurovegetative signs including an irregular sleep pattern (as little as 2-3 hrs/night) and significant weight gain associated with mood changes (>30 lbs). Despite this he is doing his best in preparing to transition to the local community outside of ARC while continuing his work at the Center. During his time here he has contributed significantly to the development of two theater productions and has worked part time as a teacher's assistant and Spanish teacher in our preschool. However, [S.M.] does continue to suffer from severe functional and social impairments including the development of few if any trusting relationships, an

inability to return to college and a failure to attain work experience outside of the Austen Riggs work program. Despite [S.M.]'s steady commitment to treatment, he has persistent difficulty engaging socially. His impairments in social functioning make his treatment within a therapeutic community setting especially critical to the development of his overall functioning capacity. Due to his severe functional impairments, [S.M.] meets criteria at this time for a residential level of care.

It is clear from [S.M.]'s previous unsuccessful treatment (intensive psychotherapy three times weekly and medication management) that [S.M.]'s emergent symptoms of psychosis and depression (complicated by his already extensive history of severe symptoms of OCD) have been resistant to treatment. The Austen Riggs Center is a specialty hospital with a treatment design that is substantially different from other facilities. It is a voluntary treatment facility with 24 hour nursing availability, psycho-pharmacological and social work services, including family therapy, a psychosocial therapeutic milieu with skill building and process groups, an activities program to support creativity and adaptive functioning and four times weekly intensive psychodynamic psychotherapy with doctoral-level psychotherapists aimed at addressing deeper characterological issues, often with debilitating comorbidities including mood and anxiety disorders, psychotic disorders and substance abuse.

It is recommended that [S.M.] remain at the Austen Riggs Center for at least six months and potentially longer term, with an opportunity to reassess the appropriate levels of care at six month intervals, so that he can continue to stabilize and regain his functioning in order to better function independently once he is ready to transition to an outpatient level of care. A premature step-down in level of care or discharge is likely to have a serious negative impact on [S.M.]'s ability to function, which could put significant risk to the gains he has begun to achieve and could risk continued damage to the remaining external structures in his life as well as increase his risk of suicide and relapse. If this happens, this could lead to unnecessarily extending the length and potential complexity and decreased efficacy of his current and future treatment needs.

20. S.M. also included copies of his medical records with the appeal. These records showed that while in treatment he continued to struggle with depression, anger, difficulty expressing emotions, feelings of inadequacy, paranoia, delusional thinking, and irrational thoughts such as being subject to mind-control or of someone trying to kill him.

21. S.M. voiced his concern that Cigna had only superficially evaluated his care and was only concerned with "check[ing] boxes on their criteria." He stated that while Cigna

referenced its criteria as the primary justification for the denial, the language of the denial letter was inconsistent with this very same criteria.

22. He wrote that Cigna had imposed additional requirements such as being medically unstable or posing a threat to himself or others, despite the fact that its own criteria contained no such requirements. He argued that it was nonsensical for Cigna to require an individual in sub-acute treatment to be experiencing acute level symptoms like homicidal or suicidal ideation.

23. S.M. included a January 2018, letter from Michael Connolly, MD which stated that an individual suffering from acute life threatening behaviors could never be treated in a residential treatment setting "without violating well-recognized standards for proper care of substance use disorders and mental health issues."

24. He argued that statements such as him not being involved in his treatment or attending ARC solely to benefit from a structured environment were simply false. He wrote that Cigna's denial of care which was partially predicated on the fact that he was making progress appeared to be a non-quantitative treatment limitation in violation of MHPAEA and that denials based on progress or lack thereof, were specifically listed by the U.S. Department of Labor as a sign of a likely MHPAEA violation.

25. S.M. wrote that under MHPAEA insurers were compelled to offer coverage for any mental health services "at parity" and "at the same coverage, scope of service, and benefit levels" as coverage provided for medical or surgical benefits in the same classification.

26. S.M. identified skilled nursing care as one of the medical or surgical analogues to his treatment and noted that while Cigna had evaluated the necessity of his treatment using proprietary criteria drafted specifically to evaluate residential treatment centers, it did not

8

even have comparable criteria for skilled nursing care, meaning that an individual

receiving skilled nursing services did not have to satisfy a litany of requirements

contained only in bespoke criteria for their treatment to be approved, but insureds

receiving residential treatment did.

27. S.M. asked in the event the denial was upheld that he be provided with the specific

reasoning for the determination along with any corresponding supporting evidence, any

administrative service agreements that existed, the Plan's clinical guidelines and medical

necessity criteria, including the Plan's mental health, substance use, skilled nursing,

inpatient rehabilitation, and hospice criteria, and any reports or opinions from any

physician or other professional regarding the claim. (collectively the "Plan Documents.")

S.M also asked the reviewer to divulge their business relationship with Cigna so that he

could verify that the review was performed by a "truly independent organization."

28. In a letter dated January 11, 2019, the external review agency upheld the decision to deny

payment for S.M.'s treatment. The letter stated in part:

> The patient's health plan definition of medical necessity is as follows:
>
> - required to diagnose or treat an Illness, Injury disease or its symptoms; **NOT MET**
> - in accordance with generally accepted standards of medical practice; **NOT MET**
> - clinically appropriate in terms of type, frequency, extent, site and duration; **NOT MET**
> - not primarily for the convenience of the patient, Doctor or health care provider; **MET**
> - not more costly than an alternative service(s), medication(s) or supply(ies) that is at least as likely to produce equivalent therapeutic or diagnostic results with the same safety profile as to the prevention, evaluation, diagnosis or treatment of the Illness, Injury, condition, disease or its symptoms; and **NOT MET**
> - rendered in the least intensive setting that is appropriate for the delivery of the services, supplies or medications. Where applicable, the Medical Director or Review Organization may compare the cost-effectiveness of

alternative services, supplies, medications or settings when determining the least intensive setting [1] **NOT MET**

The patient does not meet the above health plan definition of medical necessity. The patient is diagnosed with schizoaffective disorder, persistent depressive disorder with intermittent major depressive disorder, cannabis use disorder, and OCD. From the dates of service 2/9/18 to 9/11/18, the patient was not suicidal, homicidal, or gravely impaired for self care. He was reported being engaged in treatment. He was medication compliant. He denied any OCD symptoms or cannabis use. There is no report of him being medically unstable enough to require 24-hour management for safety. There is no documentation of immediate threat to anyone. Therefore, the residential treatment from the days of service 2/9/18 to 9/11/18 is not medically necessary.[1]

29. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

30. The denial of benefits for S.M.'s treatment was a breach of contract and caused P.M. to incur medical expenses that should have been paid by the Plan in an amount totaling over $175,000.

31. Cigna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of S.M.'s request.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

32. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

---

[1] Emphasis in original

33. Cigna and the Plan failed to provide coverage for S.M.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

34. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

35. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in the Plaintiffs' appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

36. For instance, S.M. protested that Cigna evaluated his care using undisclosed external criteria rather than the express terms of the insurance policy. This is made evident through the use of language such as, "You were described as being able to understand information presented to you" as a justification to deny treatment.

37. Cigna does not disclose in its summary plan description or any other policy documents provided to the Plaintiffs that if an individual is sufficiently lucid and able to understand information presented to them that they will either be disqualified from residential treatment outright or otherwise have their eligibility to receive residential treatment care significantly reduced. The Plaintiffs' insurance policy outwardly imposes no such requirements, but they make up the bulk of the justifications Cigna's reviewers utilized to deny care. S.M. identified a litany of such "hidden" requirements such as a danger to self

or others that were used to disqualify his treatment post hoc with no indication that any such requirements existed.

38. S.M. also pointed out that many of the factors Cigna utilized to deny payment were not even stated in the policies on which it purported to rely. Cigna stated that S.M. did not meet its Behavioral Health Medical Necessity Criteria and justified this through requirements such as a threat to self or others. However, when S.M. searched through Cigna's criteria he was unable to find any such requirements.

39. These additional requirements were not limited to Cigna but were utilized by the external review agency as well. The external reviewer listed the Plan's definition of medical necessity and argued that this was not met, but when the reviewer elaborated on why this was the case, they listed factors such as, "the patient was not suicidal" or "[h]e was medication compliant" but did not identify why these behaviors ostensibly made the treatment not medically necessary according to the Plaintiffs' insurance policy.

40. Cigna and the agents of the Plan breached their fiduciary duties to S.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.M.'s claims.

41. The actions of Cigna and the Plan in failing to provide coverage for S.M.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

42. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

43. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

44. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

45. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

46. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

47. The level of care applied by Cigna failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. S.M. included letters of medical necessity with the appeal warning of a "serious negative impact" if he were discharged prematurely. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

48. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

49. S.M. contended that Cigna violated MHPAEA in a variety of ways. One such limitation was the use of proprietary clinical guidelines to evaluate residential treatment care while having no such guidelines for skilled nursing facilities. S.M. asked for a copy of any skilled nursing guidelines from Cigna to verify this, but he was not provided with these or any of the Plan Documents he requested.

50. Additionally, S.M. demonstrated that Cigna denied his mental health services based, at least in part, on the fact that he had improved in care. S.M. alleged that Cigna had no such improvement-based restriction for analogous medical or surgical care.

51. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Cigna and the Plan evaluated S.M.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

52. As another example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that S.M. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in its statement that, "The treatment plan had led to measurable clinical improvement in your acute symptoms." Notably, Cigna's reviewer only expressed interest in whether S.M.'s "acute symptoms" had improved, even though S.M. received non-acute treatment during the timeframe at issue.

53. The external reviewer's decision was also largely predicated on a lack of acute symptoms and was based on claims such as, "the patient was not suicidal, homicidal, or gravely impaired for self care" and "There is no documentation of immediate threat to anyone." S.M. included a letter from Dr. Michael Connolly, an expert in the field of residential

treatment, who stated that residential treatment centers could not treat acute level symptoms without violating generally accepted standards of medical practice.

54. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

55. In addition, Defendants' inequal treatment of mental health facilities as opposed to medical or surgical facilities is made evident through the plain language of the denial letters themselves. Defendants make statements such as, "[t]here is no clear plan on what robust improvement is expected" as a justification for disallowing Plaintiffs' residential treatment care. Defendants do not require insureds receiving care in an intermediate level medical or surgical facility to demonstrate "robust improvement", but by the very language Cigna used in its own denial letters, it is clear that Cigna imposed such a standard on Plaintiffs' residential treatment care.

56. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

57. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

58. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for S.M.'s medically necessary treatment at ARC under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 5th day of August, 2021.

By _____s/ Brian S. King_____
        Brian S. King
        Attorney for Plaintiffs


County of Plaintiffs' Residence:
Hartford County, Connecticut